UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SOLOMON NWACHUKWU,
Plaintiff                                    CIVIL ACTION No. 1:16-cv-11815-MPK[1]

v.

VINFEN CORPORATION,
Defendant

MEMORANDUM AND ORDER ON DEFENDANT VINFEN CORPORATION'S MOTION
FOR SUMMARY JUDGMENT (#71).

KELLEY, U.S.M.J.

## I. Introduction.

Plaintiff Solomon Nwachukwu brings this employment discrimination lawsuit against defendant Vinfen Corporation, alleging he was fired because of his race, color, and national origin. *See* #26 ¶¶ 5, 14, 16. Mr. Nwachukwu was terminated on March 4, 2011 and subsequently filed an administrative complaint with the Massachusetts Commission Against Discrimination. *Id*. ¶¶ 4, 14. On May 10, 2016, plaintiff filed suit against Vinfen in the Massachusetts Superior Court, Middlesex County. (#1-3 at 4–9.) Vinfen timely removed the case to this court on September 6, 2016. *Id*. at 1–3. After the case was removed, plaintiff amended his original complaint, claiming violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.: unlawful termination on the basis of race, color, or national origin (Count I); hostile work environment (Count II); and denial of compensation and other terms (Count III). (#26 ¶¶ 15–25.)

---

[1] With the parties' consent, this case has been assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 29 U.S.C. § 636(c). (#17.)

On December 28, 2018, Vinfen filed a motion for summary judgment on all of plaintiff's claims (#71), which Plaintiff opposed. (#81.) Vinfen filed a reply. (#88.) The motion is now ready for disposition.

## II.  The Facts.

The following facts are undisputed except as indicated. Vinfen is a private organization that provides healthcare services to people with mental and physical disabilities, some of whom are referred by the Commonwealth of Massachusetts Department of Mental Health ("DMH"). (#75 ¶¶ 3–4.) Plaintiff, who is of Nigerian descent, was hired as a Nurse Coordinator for Vinfen in April 2010. (#76 ¶ 3; #82-1 ¶ 21; #85 at 31, ll. 14–16; #85-1 at 79, ll. 4–8.)

Before being hired by Vinfen, plaintiff worked as a registered nurse for approximately fourteen years and had experience caring for patients with mental health issues. (#85 at 13, ll. 16–21; 17, ll. 7–15.) His job responsibilities at Vinfen included, but were not limited to, assisting patients with various health-related tasks, discharge planning for patients in the hospital, and taking vital signs. Id. at 32, ll. 3–18. Plaintiff often travelled offsite to meet with patients at their homes, residential facilities, hospitals, and nursing homes throughout northeastern Massachusetts. Id. at 34, ll. 5–22. Plaintiff, like all other Vinfen employees, used his personal vehicle to visit patients and then submitted a mileage log for reimbursement from Vinfen. (#89 ¶ 30.)

When Vinfen employees visit a patient, they use a template available in Vinfen's system to record service notes. (#85 at 97–98, ll. 24–10.) The service notes include information about medications, objectives, services performed, and patient goals. Id. at 83–84, ll. 6–4. Service notes are printed, signed, and submitted to the team administrative assistant to be filed and given to the team leader. Id. at 98, ll. 13–17; 102, ll. 18–22. On occasion, Vinfen team members discuss the

service notes and patients during morning meetings, which occur each day at 8:00 a.m. *Id.* at 35, ll. 12–14; 102, ll. 1–5. Service notes are submitted to the DMH for billing. *Id.* at 107, ll. 11–14.

Plaintiff asserts in his affidavit in opposition to Vinfen's motion for summary judgment that he was never paid for any mileage he traveled to visit patients. (#82-1 ¶ 68.) He does not, however, dispute the validity of the paystubs on the record, which indicate he was paid "Expense Reimbursements" for mileage on July 23, 2010 and March 18, 2011. (#92-1; #92-2; #92-3; #92-4.)

Plaintiff's relationship with his supervisor and team leader, Susan Squiers, was strained. Plaintiff indicates in his affidavit that Squiers was "extremely hostile" towards him, by making fun of the way he spoke "especially in front of other employees and during [] usual morning staff meetings," questioning whether patients would allow him into their homes, and stating she was "not sure" she wanted him to administer her flu shot. (#82-1 ¶¶ 70–73.) Plaintiff also maintains that Squires denied his requests for trainings during work hours and made him use personal time off when he returned to the office late after an offsite meeting, though she did not require the same of other employees who also returned late, and, on August 12, 2010, made "a jest and caricature" of him by claiming that a form he had submitted regarding a patient's doctor's orders was not valid. *Id.* ¶¶ 77–78; #84 at 27.

Plaintiff further alleges that he emailed Squiers on August 17, 2010 to complain about a colleague's "continued abuse and derogatory comment[s]" and again on October 3, 2010 regarding her own treatment of him. *Id.* Plaintiff claims that, in the October 3rd email, he threatened to approach "higher management staff" if Squiers did not end the "very stressful environment and working under constant pressure." *Id.* Plaintiff also testified at his deposition that he spoke to Tania

Ruiz, Squiers' supervisor, more than once to complain about his "concerns" regarding his working relationship with Squiers. (#85 at 62, ll. 3–13; #85-1 at 154, ll. 11–13.)

On November 30, 2010, plaintiff noticed that his family photograph he kept on his desk had been defaced, in that someone had written "U SUCK" across his face in black marker. (#84 at 28; #84-1 at 7.) He informed Squiers and asked colleagues who did it, but ultimately did not find out who had defaced his photo. (#82-1 ¶ 79.) Plaintiff alleges that Squiers ignored his complaint and did not investigate the defacement. *Id.* ¶ 79.[2]

Multiple complaints were lodged against plaintiff regarding his treatment of colleagues and his work practices during his tenure at Vinfen. Colleagues emailed Squiers on September 28, 2010 and October 13, 2010 informing her that plaintiff was being "intimidating and uncomfortable," and "verbally aggressive." (#77-2; #77-3.) The October 13th complaint further alleged that plaintiff failed to "properly communicate" information about a patient's doctor, leaving his colleague without appropriate documentation at a patient visit. (#77-3.) An October 14, 2010 email to plaintiff directly from a colleague noted that he failed to show up at a scheduled patient appointment. (#74-2 at 6.)[3]

Plaintiff also received complaints from outside sources. On September 14, 2010, plaintiff visited patient SP at home. (#82-1 ¶ 24.) Plaintiff maintains that SP informed him that a service

---

[2] Plaintiff had, however, praised Squiers on at least one occasion. When his father passed away, he requested an extended personal leave of absence from Vinfen between December 9, 2010 and January 14, 2011, so that he could travel to Nigeria to be with his family. (#84-1 at 11.) Squiers approved the leave, and upon his return, plaintiff expressed his appreciation by giving Squiers a gift. (#74-2 at 4, 5; #85 at 45, ll. 19–21; 46, ll. 21-24.) While plaintiff alleges that Squires initially denied his leave, he provides no support for this allegation. (#85 at 43, ll. 3–7.)

[3] Plaintiff denies or disputes all these allegations. (#82-1 ¶¶ 32, 39, 98.) However, the record includes copies of each email described. (#74-2 at 6; #77-2; #77-3.) Plaintiff alleges that Squiers "put [the complainants] up to sending [the] emails," but only cites his belief that they socialized outside of work as evidence for his assertion. (#85-1 at 145, ll. 16–24.)

provider from another organization called Homecare was "rarely available and whenever she visit[ed] she rarely d[id] her job." *Id.* SP indicated she was afraid to tell the other service provider about "how dissatisfied she felt with her services[,]" and plaintiff offered to speak with the organization on her behalf. *Id.* While Squiers initially commended plaintiff for speaking with the organization (#85 at 69, ll. 17–21), on September 20, 2010, Julie DeLillo, Vinfen's Director of Human Resources, emailed Squiers, notifying her that HR had received a complaint from Homecare. (#77-1 at 2.) The complaint stated that, when plaintiff called Homecare on SP's behalf, he was "yelling at the staff . . . in front of the clients . . . ." *Id.* Plaintiff argues in his affidavit that he was not disciplined for the alleged events regarding SP or ever informed that this complaint was made prior to his termination, and that the allegations laid out in the email from DeLillo are "completely unfounded and totally false." (#82-1 ¶¶ 25, 29.)

Vinfen also alleges that, on separate instances, plaintiff took credit for a colleague's work and fabricated work product. On November 1, 2010, two copies of a service note for a visit to patient EG were submitted, one signed by Beth Ajalat, another Vinfen employee, and one signed by plaintiff. (#74-2 at 10, 11.) The service note signed by plaintiff was not dated. *Id.* at 10. While plaintiff did not visit patient EG on November 1, 2010 (#82-1 ¶ 65), on November 30, 2010, there was a morning staff meeting, at which Vinfen alleges plaintiff presented the November 1st service note as though it was his work. (#77-4 at 4.) Plaintiff states that he picked up and signed the EG service note in error and that he intended to shred it. (#85 at 116–17, ll. 19–4; #85-1 at 93, ll. 19–22.) He alleges it was maliciously taken from his desk and submitted by Squiers without his knowledge. *Id.* at 119, ll. 9–23. Plaintiff also alleges that he was not present at this staff meeting and presents a team schedule to validate this claim, arguing that he could not have attended because he did not begin work until 12:00 p.m. that day. (#84-1 at 5.) However, Vinfen's assertion that

plaintiff was at the November 30th meeting is supported by an attendance log, which includes plaintiff's name and signature on the list of attendees. (#90-4; #85-1 at 168, ll. 2–8.)

On December 2, 2010, SL, another patient of Vinfin, contacted Squiers to complain that plaintiff had not visited her in the last two months. (#75-1 at 2–3.) [4] Vinfen filed a formal complaint with DMH, as required under Massachusetts law, and the matter was investigated pursuant to DMH policy. (#75 ¶ 5; #75-3 at 2.) Brad Richardson, DMH's Human Rights Coordinator, contacted Jeanne Russo, Vice President of Vinfen and "Person in Charge" for the DMH Northeast Region, to handle the matter. (#75 ¶¶ 7–9; #75-2 at 2.) Russo assigned Catherine Eccles, Vinfen's Operations Director, to serve as the Fact Finder to investigate SL's complaint. (#75 ¶ 10.)[5] After reviewing documents and interviewing SL and Vinfen employees, Eccles prepared a report, finding that SL's complaint was substantiated. (#91 ¶¶ 7–8; #91-1 at 1–4.) The report stated:

> I found that although Solomon [plaintiff] is denying the allegations, evidence exists indicating that Solomon did not make home visits to [SL] on the dates reflected on Service Notes bearing his signature. I found additional evidence indicating falsification of documentation and taking credit for another employee's work, which directly violates Vinfen's standards for employee conduct.

(#91-1 at 3.)

Plaintiff disputes the validity of SL's complaint and the impartiality of the investigation. He contends that SL was heavily medicated and "pleasantly confused," and therefore, could not

---

[4] Plaintiff alleges that he visited SL on October 5th and October 25, 2010, and submitted service notes for these two visits. (#82-1 ¶ 86; #74-2 at 7–8.) However, SL indicated that plaintiff had never scheduled any appointments with her in October 2010, and in fact, her calendar indicated she had other appointments on the dates that plaintiff alleges he visited her. (#77-4 at 3.) SL also indicated that plaintiff missed a scheduled appointment in November 2010. (#75-1 at 2–3; #77-4 at 3.)

[5] Pursuant to Vinfen protocol, plaintiff and Eccles did not have any type of relationship and, in fact, had never met prior to the investigation. (#74 at 136, ll. 3–9; #75 at 2 ¶ 8; #85 at 136, ll. 3–9; #85-1 at 24, ll. 13–16.)

be relied on to accurately report whether service providers had visited her on a given day. (#85 at 88, ll. 9–17.) He also argues in his affidavit in opposition to Vinfen's motion that Eccles' investigation was "bogus," noting that he was only interviewed for about three minutes and was not provided with details of the allegations. (#82-1 ¶¶ 111–12.) However, Vinfen's investigation into the complaint showed that SL kept meticulous notes and always recorded the dates of her appointments in her calendar. (#77-4 at 3–4.) It also showed that SL, Squiers, Ajalat, and plaintiff were all interviewed and numerous documents relevant to the complaint were reviewed. *Id.* at 2.

On March 4, 2011, after consulting with Russo and ensuring that all protocol were followed, Vinfen's Senior Human Resources Manager, Ann Tenero, and Vinfen's Operations Director, Tania Ruiz, terminated plaintiff's employment and provided him with a Corrective Action Form, citing SL's complaint and the findings that emerged in the subsequent investigation as the reasons for his termination. (#76 ¶¶ 10–14; #76-1 at 2–3.) Vinfen also cited plaintiff's falsification of the November 1st service note for patient EG. (#76-1 at 2.) On June 6, 2011, Vinfen hired a man of the same race (black) and national origin (Nigerian) as plaintiff as his replacement. (#77 ¶ 10.)

For the following reasons, Vinfen's motion for summary judgment as to plaintiff's claims for unlawful termination (Count I) and denial of compensation and other terms (Count III) is granted, and Counts I and III are dismissed. Vinfen's motion for summary judgment as to plaintiff's claim for hostile work environment (Count II) is denied.

### III.  Standard of Review.

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party bears the initial burden of

averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). Once the moving party asserts the absence of a genuine issue of material fact, the nonmovant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54–55 (1st Cir. 2006). "[I]mprobable inferences, conclusory allegations, or rank speculation" cannot alone defeat summary judgment. *Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005).

In determining whether summary judgment is proper, courts view the record in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the nonmovant's favor. *Caraballo-Caraballo v. Corr. Admin*, 892 F.3d 53, 56 (1st Cir. 2018) (citations omitted). Upon a party's motion, Rule 56 requires the entry of summary judgment when the nonmoving party fails to establish the existence of any one essential element on which he will bear the final burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citations and quotation marks omitted).

## IV. Legal Argument.

### A. Counts I and III.

In analyzing disparate treatment claims, including those for unlawful termination on the basis of race, color, or national origin (Count I) and denial of compensation and other terms (unequal pay) (Count III), courts utilize the *McDonnell Douglass* burden shifting framework where, as here, a plaintiff cannot demonstrate direct evidence of an employer's "discriminatory motivations[.]" *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018) (citing

*Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 446 (1st Cir. 2009)). This burden shifting framework consists of three steps. Plaintiff must first "establish[] a *prima facie* case of . . . discrimination." *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). This burden is "not onerous," but requires demonstrating the case sufficiently to "give[] rise to an inference that the employer discriminated" against the plaintiff. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("[e]stablishment of the *prima facie* case . . . creates a presumption that the employer unlawfully discriminated against the employee").

The burden then shifts to the employer to demonstrate that the employment action was taken for some legitimate, nondiscriminatory reason. *Mesnick*, 950 F.2d at 823. The employer need only prove that a legitimate, nondiscriminatory reason exists, not that this was the "actual[] motivat[ion]." *Burdine*, 450 U.S. at 254.

 If the employer meets its burden, the burden shifts back to the plaintiff to prove "by a preponderance [of evidence], that the [employer's] explanation is a pretext for unlawful discrimination." *Rivera-Rivera*, 898 F.3d at 88 (quoting *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 221 (1st Cir. 2007)). The First Circuit requires "the employee [to] produce not only minimally sufficient evidence of pretext, but [also] evidence that overall reasonably supports a finding of discriminatory animus." *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria P.R.*, 322 F. Supp.2d 164, 169 (D.P.R. 2004) (internal citations and quotation marks omitted). This requires the plaintiff to "elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive[.]" *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990). The plaintiff bears the "ultimate burden . . . to persuade the trier of fact that [he was] treated differently

based on" discriminatory animus. *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002) (internal citations and quotation marks omitted).

    1.   <u>Count I: Unlawful Termination</u>.

    To demonstrate a *prima facie* case for unlawful termination on the basis of race, color, or national origin under Title VII, plaintiff must show the following:

> (1) [that] he belonged to a protected class . . . ; (2) he was performing his job at a level that rules out the possibility that he was fired for job performance; (3) he suffered an adverse job action by his employer; and (4) his employer sought a replacement for him with roughly equivalent qualifications.

*Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994)). A plaintiff's failure to meet any of the *prima facie* elements is dispositive of his entire claim. *See Caez-Fermaint v. State Ins. Fund Corp.*, 286 F. Supp.3d 302, 311 (D.P.R. 2017) (citing *Mulloy v. Acushnet Co.*, 460 F.3d 141, 154 n.8 (1st Cir. 2006)).

    The only element at issue here is the second, as plaintiff can easily demonstrate, and Vinfen does not dispute, that the three other elements are present. (#72 at 8.) Vinfen argues that the plaintiff "cannot demonstrate he was performing his job at a level that rules out the possibility he was fired for job performance" because he falsely submitted documentation for patient visits that he did not complete. *Id.* It maintains that, because the state pays for its patient visits, plaintiff's actions "not only jeopardized [patients'] well-being [but] also similarly put Vinfen's relationship with the state at risk as it prompted payment for services that were not rendered." *Id.* at 8–9.

    Plaintiff presents a *prima facie* case for discrimination under *McDonnell Douglas'* first prong. It is well-settled that a plaintiff will meet his burden under the second element of the first prong if he presents evidence, "which[,] if believed," shows that he was performing his responsibilities proficiently. *Tsai v. McDonald*, No. 11676-MBB, 2017 U.S. Dist. LEXIS 130280, at **16–17 (D. Mass. Aug. 16, 2017) (quoting *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d

128, 139 (1st Cir. 2012) (internal quotation marks omitted)) (plaintiff satisfied burden when her co-worker testified that she was "hard-working, efficient, and very competent" and that she "trained her fellow employees on processes with which they were uncomfortable"). Similar to the plaintiff in *Tsai*, plaintiff presents evidence of such positive reinforcement, in that Squiers did praise his work on occasion and, in fact, initially commended him for his handling of the situation with Homecare. (#85 at 69, ll. 17–21.)

Although the evidence that plaintiff presents is thin, courts within this circuit have been cautious in dismissing cases solely based on *McDonnell Douglass*' first prong, where, as here, the employer's proffered reason for termination is the same as its argument that the plaintiff was not qualified for his job. *See Acevedo-Parrilla*, 696 F.3d at 139; *Velez*, 585 F.3d at 448; *Eswarappa v. Cmty. Action Inc./Head Start*, No. 14-14255-FDS, 2017 U.S. Dist. LEXIS 117849, at *15 (D. Mass. Jul. 27, 2017) ("because [employer's] contention that [plaintiff] was not qualified [for her job] relies upon its proffered legitimate reason for her termination, the [c]ourt will assume for present purposes that plaintiff has satisfied her *prima facie* burden and proceed to the second step of the burden-shifting framework").

Plaintiff's unlawful termination claim still fails, however. Turning to *McDonnell Douglas'* second prong, Vinfen provided several legitimate, non-discriminatory reasons for terminating plaintiff: the complaints made by his co-workers against him, the complaint from Homecare, the fabrication of the service note detailing his alleged visit to patient EG, and the results of Vinfen's investigation of patient SL's complaint. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer met "burden by offering admissible evidence sufficient for the trier of fact to conclude that [plaintiff] was fired because of his failure to maintain accurate attendance records"); *Acevedo-Parrilla*, 696 F.3d at 140 (employer provided legitimate, non-discriminatory

reason for terminating plaintiff by noting his difficulty with complying with quality control standards); *Eswarappa*, 2017 U.S. Dist. LEXIS 117849, at **15–16 (employer provided legitimate non-discriminatory reason by noting "numerous problems with [plaintiff/teacher's] performance[,]" including "speaking harshly to an assistant teacher in front of the children" and engaging the children "in activities that were not developmentally appropriate").

Plaintiff is also unable to prove by a preponderance of evidence that Vinfen's stated reasons for terminating him were pretextual and that the evidence reasonably supports a finding of discriminatory animus under *McDonnell Douglas'* third prong.[6] While "courts should exercise particular caution before granting summary judgment on issues such as pretext," *Acevedo-Parrilla*, 696 F.3d at 140 (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000)), the "slight suggestion of pretext[,]" absent any other evidence to support the claim, is insufficient to infer discrimination. *Zapata-Matos*, 277 F.3d at 47.

"[T]he court must look at the total package of proof offered by the plaintiff." *Benoit*, 331 F.3d at 174 (citing *Mesnick*, 950 F.2d at 824). This includes "'the perception of the decisionmaker,' that is, whether the employer believed its stated reason [for the adverse employment action] to be credible." *Mesnick*, 950 F.2d at 824 (quoting *Gray v. New Eng. Tel.& Tel. Co.* 251, 256 (1st Cir. 1986)) (noting that plaintiffs may use circumstantial evidence, including statistical evidence showing disparate treatment by the employer of the protected class members, comments

---

[6] Put differently, it is the plaintiff's burden at the third stage to "persuade the factfinder that [he] experienced unlawful discrimination at the hands of [his] employer . . . , by presenting sufficient evidence to show *both* that the employer's articulated reason for [the discharge was] a pretext and that the true reason was discriminatory." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 34 (1st Cir. 2001) (emphasis added) (internal citations and quotation marks omitted). "The 'same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" *Id.* (quoting *Feliciano De La Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 6 (1st Cir. 2000)).

denigrating the protected class, differential treatment in the workplace, and the deployment of a replacement outside the protected class in order to show a discriminatory animus); *Velez*, 585 F.3d at 450 (internal citations and quotation marks omitted) ("[a] plaintiff can . . . establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons"). "Statements by supervisors carrying the inference [of] . . . animus against protected classes of people or conduct are clearly probative of pretext, . . . even if that inference is not the only one that could be drawn from the comment." *Acevedo-Parrilla*, 696 F.3d at 144 (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167, 171 (1st Cir. 1998)).

Applying these principles, the First Circuit in *Mesnick* concluded that plaintiff failed to prove that his employer's reasons for terminating him – plaintiff's insubordination and inimicality – masked a discriminatory animus. *Mesnick*, 950 F.2d at 825. The plaintiff had filed a claim based on the Age Discrimination in Employment Act ("ADEA") and primarily provided evidence "to illustrate his professional competence and ability to work well with others." *Id.* at 825–26. However, apart from two isolated occurrences, a comment from a superior praising the "youth of the work force" and the fact that a recruiting firm listed potential employees' ages, "the vast majority [of the proffered evidence] had nothing at all to do with age or with the employer's true motives." *Id.* at 826.

In contrast to *Mesnick*, the First Circuit held in *Velez*, another case brought under the ADEA, that plaintiff had raised a genuine issue of material fact about whether the employer's stated reason for terminating him was a pretext for age-based discrimination when his employer provided "shifting explanations" for his termination. *Velez*, 585 F.3d at 449. "[T]he ambiguity of

[the employer's] company policy and the resulting uncertainty as to whether [plaintiff] violated it," and the fact that the employer took no disciplinary action "in response to arguably similar conduct by younger employees" also supported an inference that plaintiff was terminated based on a discriminatory animus. *Id.*

Vinfen's proffered reasons for terminating plaintiff's employment – the complaints made by his co-workers against him, the fabrication of the service note detailing his alleged visit to patient EG, Homecare's complaint, and the results of Vinfen's investigation of patient SL's complaint – were legitimate and consistent. *See Zapata-Matos*, 277 F.3d at 47. Similar to *Mesnick*, but unlike *Velez*, Vinfen's proffered reasons had nothing whatsoever to do with plaintiff's age and national origin. While Squiers' alleged making fun of the way plaintiff spoke, questioning whether patients would allow plaintiff into their homes, and uneasiness about plaintiff's ability to administer her flu shot may have shown discriminatory animus, depending on the context of her comments, plaintiff, unlike the plaintiff in *Velez*, presents no evidence whatsoever indicating that he was terminated based on a pretext for discrimination. Indeed, plaintiff was terminated shortly after Eccles' investigation, conducted in accordance with both Vinfen and DMH procedures, revealed that patient SL's complaints were substantiated.

Other cases have held that plaintiffs have failed to show pretext for discrimination under similar circumstances. *See Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 73 (1st Cir. 2015) (plaintiff failed to show discriminatory animus when there was "nothing to connect [plaintiff's] general and vague allegations of hostility . . . to . . . protected activity, rather than to his unauthorized" conduct); *Straughn*, 250 F.3d at 35–37 (supervisor's use of "offensive 'southern black' workplace accent" in plaintiff's presence, while arguably probative of bias against African Americans, was not, without more, probative of pretext, given "the absence of any discernable

contextual or temporal relationship between the" accent and the discharge decision, "the demonstrably self-sufficient basis for the management recommendation" to demote plaintiff "due to her persistent work-related dishonesty," and the "subordinate role" the supervisor played in the decision to terminate plaintiff); *Zapata-Matos*, 277 F.3d at 47–48 ("[c]onsidering . . . the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and other evidence supporting the employer's case, the employer [was] entitled to judgment as a matter of law"); *McMillen v. Ma. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1st Cir. 1998) (remarks by male department head, regarding physical traits and sexual activities of female co-workers, not probative of pretext when issue involved female employees' lower salaries), *cert. denied*, 525 U.S. 1104 (1999).[7]

The factual disputes plaintiff raises with respect to Vinfen's proffered reasons for his termination (#82-1 ¶¶ 52–60, 86, 110) are unavailing. "[E]ven in employment discrimination cases where elusive concepts such as motive and intent are at issue, summary judgment is appropriate if the nonmoving party merely rests upon conclusory allegations, improbable inferences, and unsupported speculation." *Delgado Echevarria v. AstraZeneca Pharm., LP*, 856 F.3d 119, 134 (1st Cir. 2017) (quoting *Ameen*, 777 F.3d at 68). While plaintiff testified that the allegations against him and the investigation of SL's complaint were fabricated at Squiers' request (#85 at 145, ll. 2–11; #85-1 at 136, ll. 6–9; 138, ll. 18–20; #82-1 ¶ 60), plaintiff's only support for his argument is his own perception of Squiers' malicious intent and his unfounded belief that Squiers and Eccles were part of a similar social network. (#85-1 at 25, ll. 16–22.) Because nothing on the record demonstrates any wrongdoing in the investigation, plaintiff's conclusory allegation must be

---

[7] The fact that Vinfen hired a man of the same race (black) and national origin (Nigerian) as plaintiff as his replacement, (#77 ¶ 10), further shows why plaintiff fails to satisfy *McDonnell Douglas'* third prong.

ignored. *See Ameen*, 777 F.3d at 72 (noting that "[t]he mere fact of an investigation – particularly one spurred by a violation of company policy – is not proof of [discriminatory] animus").

It should also be noted that, when an employment action is based on an investigation, "[t]he question is not whether plaintiff's or his fellow employees' version [of events] is the true one, but whether [the fact finder] believed what he had been told by those he interviewed." *Ronda-Perez*, 404 F.3d at 45–47 (plaintiff failed to show pretext when investigator found employee responses to be credible and found no reason to disbelieve them); *see also Zapata-Matos*, 277 F.3d at 45; *Eswarappa*, 2017 U.S. Dist. LEXIS 117849, at *17 (citations omitted) (plaintiff failed to show pretext for discrimination when she "failed to offer any evidence that [her employer] did not believe its stated reasons for terminating her, that it provided inconsistent reasons for her termination, or that its proffered reason [was] implausible").[8]

    2.  <u>Count III: Denial of Compensation and Other Terms.</u>

---

[8] Plaintiff's remaining arguments are unavailing. It is well-settled that satisfactory work performance and occasional praise of an employee's work, without more, prior to a plaintiff's termination are insufficient to show pretext. *See Benoit*, 331 F.3d at 174 ("one performance review stating that [plaintiff's] attendance was 'better' but 'still needs improvement' is insufficient to create a trialworthy issue as to pretext, especially since attendance issues were not the only reasons given by [the employer] for firing [the plaintiff]"). Therefore, Squiers' occasional praise of plaintiff's performance and her initial compliments regarding plaintiff's handling of the Homecare situation are of no matter.

The fact that Eccles, Russo, Tenero, and Ruiz, the Vinfen employees who investigated and/or made the decision to terminate plaintiff, were of different races and national origins than plaintiff, standing alone, is also insufficient to show discrimination. *See Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534 (1st Cir. 2002) ("mere fact that decisionmakers were male does not alone, absent other evidence, create an inference that they engaged in gender discrimination").

Finally, the First Circuit has held in another case that it could not see how "any lack of clarity in giving notice of [a] particular charge could point to any devious effort to conceal . . . discrimination." *Ronda-Perez*, 404 F.3d at 46.

Plaintiff also alleges in his amended complaint that Vinfen subjected him to disparate treatment in that it "routinely denied [him] mileage credit [that he] properly documented and submitted to his supervisor[,]" and "[o]ther employee's mileage claims were approved." (#26 ¶¶ 10–11.) Plaintiff's denial of compensation claim is best framed as an equal pay claim. In addition to showing that he is a member of a protected class and that he was meeting his employer's expectations, plaintiff needs to show that he "suffered adverse employment action with respect to compensation"; and "similarly[]situated employees outside the protected class received more favorable treatment" in order to prove a *prima facie* case. *Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp.3d 317, 328 (D. Mass. 2015) (quoting *Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008)). Plaintiff fails to show that either of these two elements are present here.

Vinfen's alleged denial of plaintiff's mileage reimbursement does not constitute "adverse employment action." "An adverse employment action 'typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) (quoting *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010)). To be considered adverse, "an employment action 'must materially change the conditions of the plaintiff's employ.'" *Id.* at 94–95 (quoting *Gu v. Bos. Police Dep't.*, 312 F.3d 6, 14 (1st Cir. 2002)) (loss of three shifts during three separate holiday weeks and one-week shift reduction did not constitute adverse employment actions, when there was no evidence that such reductions would lead to loss of benefits, such as health insurance, "in the context of a workplace where schedules fluctuate and no employee is entitled to any given shift"). The court has not found

any case within this circuit holding that the withholding of an employee's mileage reimbursements, without more, is sufficiently adverse.

Even if Vinfen's alleged failure to reimburse plaintiff could be considered an "adverse employment action," plaintiff fails to introduce evidence showing that he was not reimbursed. While plaintiff testified at his deposition that Vinfen never paid him for any mileage reimbursement (#85 at 95, ll. 5–6), the record reflects, and plaintiff does not dispute, that he submitted mileage forms, and Vinfen paid him reimbursements in the amounts of $160.44 and $103.96 on July 23, 2010 and March 18, 2011, respectively. (#92-1; #92-2; #92-3; #92-4.) *See Rivera-Rivera*, 898 F.3d at 90 (summary judgment appropriate when plaintiff failed to provide a direct factual basis for doubting evidence employer proffered regarding salary chart). Plaintiff also testified that, at some point, he stopped submitting claims for mileage reimbursement. (#85 at 15–16.)

Plaintiff also fails to show that other, "similarly situated" employees at Vinfen received more favorable mileage reimbursement. Plaintiff provides no "legitimate comparator[s]" to demonstrate how he was "similarly situated" to his coworkers. *See Goldstein*, 80 F. Supp.3d at 329 (internal citations and quotation marks omitted) ("comparison . . . based on what [plaintiff] heard from other interpreter friends whose names she could not recall at her deposition, is insufficiently supported to provide any meaningful comparison"). The only evidence he provides in support of his assertions that his co-workers were reimbursed differently than he was is his deposition testimony that he believed his colleagues were similarly situated, but treated differently from him, because they did not complain about not being reimbursed at meetings, and when asked, they informed him that they were "always" reimbursed for their mileage. (#85-1 at 92, ll. 1–13.) These assertions are hearsay, out-of-court statements offered for the truth of the matter asserted

and cannot be considered. *See Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 71 (1st Cir. 2011) (internal quotation marks omitted) ("tenuous mentions of . . . co-workers' out-of-court statements all constitute inadmissible hearsay"); *Goldstein*, 80 F. Supp.3d at 329 (internal citations and quotation marks omitted) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

Vinfen correctly points out that, in the unlikely event that plaintiff could demonstrate a *prima facie* case for his denial of compensation claim, it offered a legitimate, non-discriminatory reason for denying at least one mileage reimbursement request. (#72 at 20.) Plaintiff submitted a reimbursement request in February 2011, but Squiers informed him that there were "discrepancies that [they] need[ed] to discuss before [she was able] to approve." (#84 at 15.) Nothing in the record demonstrates that plaintiff ever discussed these discrepancies with Squiers or that Vinfen was unwilling to reimburse plaintiff for an accurate mileage claim.

Plaintiff is also unable to show pretext indicating that Vinfen's alleged failure to give him any mileage reimbursement was motivated by discriminatory animus. This court has noted:

> Although pretext can in some cases be shown "by producing evidence that [the] plaintiff was treated differently from similarly situated employees," *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008), where the defendant has offered a reason for that different treatment, the plaintiff must provide some evidence that would permit a reasonable inference that the reason is false and indeed a cover-up. *See Reeeves*, 530 U.S. at 147.

*Goldstein*, 80 F. Supp.3d at 330–31. Because plaintiff provides, at best, only "conclusory allegations and unsupported inferences," as to pretext for discriminatory animus, his denial of compensation claim must be dismissed.

B.  Count II: Hostile Work Environment.

To prevail on his hostile work environment claim, plaintiff must demonstrate the following: "(1) [that] he is a member of a protected class; (2) he experienced uninvited harassment; (3) the

harassment was racially-based; (4) the harassment was so severe or pervasive as to create an abusive work environment; and (5) the harassment was objectively and subjectively offensive." *Prescott*, 538 F.3d at 42 (citations omitted). "In general, a plaintiff may recover on such a theory when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Noviello v. City of Bos.*, 398 F.3d 76, 84 (1st Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Plaintiff presents evidence sufficient to create an issue of fact as to his hostile work environment claim. Plaintiff's status as a black man of Nigerian descent clearly puts him in a protected class based on his race and national origin, and he experienced multiple forms of uninvited harassment, many of which could be considered racially motivated, as well as both objectively and subjectively offensive.

Vinfen's argument that there is no "actual evidence to support [plaintiff's] allegations" (#72 at 17) is inaccurate. It is well-settled that plaintiff must set forth facts supporting his hostile work environment claim "in affidavits, depositions, and the like." *See Avci v. Brennan*, 285 F. Supp.3d 437, 442 (D. Mass. 2018) (quoting *Noviello*, 398 F.3d at 84) (internal quotation marks omitted)); *see also Rivera-Rivera*, 898 F.3d at 92 (noting that the First Circuit has been protective of plaintiffs' rights in Title VII cases, granting a level of leniency that does not require a highly "precise level of specificity"). Here, plaintiff indicated in his affidavit that Squiers made fun of the way he spoke, "especially in front of other employees and during [] usual morning staff meetings," questioned whether patients would allow him into their homes, and stated that she was "not sure" she wanted him to administer her flu shot. (#82-1 ¶¶ 70–73.) He noted that Squiers claimed that a form he had submitted regarding a patient's doctor's orders was not valid, failed to investigate the

defacement of his family photograph, and failed to act on his colleague's abusive behavior. *Id.* ¶¶ 77–79; #84 at 27. Plaintiff also testified at his deposition that he spoke to Ruiz, Squiers' supervisor, more than once to complain about "concerns" regarding his working relationship with Squiers. (#85 at 62, ll. 3–13; #85-1 at 154, ll. 11–13.)

This evidence is also sufficient to create an issue of fact as to whether Squiers' actions were severe and/or pervasive enough to constitute a hostile work environment. To make this determination, one must review the specific circumstances of each case. *Rivera-Rivera*, 898 F.3d at 91. These can include "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Id.* (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)). These issues are to be left to the finder of fact, "[s]ubject to some policing at the outer bounds." *Id.* (internal quotations and citation omitted). "[O]rdinary, if occasionally unpleasant, vicissitudes of the workplace[,]" will not be found to create a hostile work environment. *Id.* (citation omitted).

Applying these principles, the First Circuit in *Noviello* concluded that plaintiff had created an issue of fact as to her hostile work environment claim when she demonstrated that she had been "subjected to a steady stream of abuse" since reporting her supervisor's misconduct. *Noviello*, 398 F.3d at 93. Specifically, plaintiff presented evidence that she had been falsely accused of misconduct, falsely informed that she was required to take dinner breaks alone, and continually taunted by a co-worker without any intervention by her superiors. *Id.* at 93–94; *see also Rivera-Rivera*, 898 F.3d at 93–94 (plaintiff's hostile work environment claim should have survived employer's summary judgment motion, as plaintiff produced evidence that she was taunted for her age every day for over two years).

21

Like the plaintiffs in *Noviello* and *Rivera-Rivera*, plaintiff presents evidence showing he was repeatedly taunted by Squires without any intervention, given the frequency of the staff meetings and the fact that he had complained to Squiers' supervisor to no avail. Squiers' questioning plaintiff's ability to administer her flu shot, stating that a form he submitted was invalid, and questioning whether patients would allow plaintiff into their homes also implicates his ability to do his job. While none of these incidents, standing alone, would be considered egregious enough to constitute a hostile work environment, the First Circuit has noted that "[m]ost hostile work environments [like this one] are bred from an ongoing series of harassing incidents." *Noviello*, 398 F.3d at 84. It is true that a jury may ultimately determine that these incidents are not severe and/or pervasive enough to constitute a hostile work environment. However, a court's "function is one of screening, that is, to determine whether, on particular facts, a reasonable jury could reach such a conclusion." *Id.* at 94 (citing *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001)). Reviewing the specific facts and circumstances of this case, the court is of the view that a reasonable jury could find that Squiers' actions created a hostile work environment.

## V.  Conclusion.

Vinfen's motion for summary judgment (#71) is GRANTED as to plaintiff's unlawful termination claim (Count I), DENIED as to plaintiff's hostile work environment claim (Count II), and GRANTED as to plaintiff's denial of compensation claim (Count III).


/s/ Page Kelley
M. Page Kelley
United States Magistrate Judge

November 4, 2019